2512

The STATE, Respondent v. Kenneth Wayne EASLER, Appellant.

(471 S.E. (2d) 745)

Court of Appeals

334

Senior Assistant Appellate Defender *Wanda H. Haile,* of South Carolina Office of Appellate Defense, Columbia, *for Appellant.*

*Attorney General Charles Molony Condon, Assistant Deputy Attorney General Donald J. Zelenka, Senior Assistant Attorney General Charles H. Richardson,* and *Assistant*

*Attorney General Charles F. Reid,* Columbia; and *Solicitor Holman C. Gossett, Jr.,* Spartanburg, *for Respondent.*

Submitted Apr. 2, 1996.

Decided May 13, 1996; Reh. Den. June 21, 1996.

ANDERSON, Judge:

Appellant was convicted of reckless homicide, assault and battery of a high and aggravated nature (ABHAN), felony driving while under the influence (DUI) causing great bodily injury, felony driving while under the influence (DUI) causing death, leaving the scene of an accident, and driving under suspension (second offense).

He was sentenced as follows: (1) Felony DUI causing death—twenty-five years; (2) Felony DUI causing great bodily injury—fifteen years, consecutive; (3) Reckless homicide—five years, concurrent; (4) ABHAN—ten years, concurrent; (5) Leaving the scene of an accident—one year, concurrent; and (6) Driving under suspension, second offense—six months, concurrent.

Appellant appeals various rulings of the trial judge. We affirm.

## *ISSUES*

Appellant posits five issues on appeal:

1. The trial court erred in denying Appellant's motion to suppress statements made to police officers prior to his arrest because the statements were given without benefit of the required warnings under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. (2d) 694 (1966).

2. The trial court erred in quashing the first jury panel selected in the case after finding that the defense exercised its peremptory challenges in a racially discriminatory manner.

3. The trial court erred in denying Appellant's motion for a change of venue in the case.

4. The trial court erred in denying Appellant's motion to dismiss the convictions in the case and grant a new trial because the convictions violated the double jeopardy clause.

5. The trial court erred in denying Appellant the opportunity to plead guilty to several of the State's indictments.

## MIRANDA

On the afternoon of April 15, 1994, Constance Roberts was driving with her children. A truck, coming in the opposite direction, swerved into her lane and struck her vehicle. Ms. Roberts suffered severe injuries, and her son, Cornelius, was killed. Appellant was later arrested as the driver of the truck.

Before trial, Appellant made a motion to suppress statements made by him shortly after the accident that he claimed were taken in violation of *Miranda*. During an *in camera* hearing, Officer John McCall testified about the incriminating statements that Appellant made. McCall stated that he was on patrol near the accident scene on the day of the accident. By police radio, he received information that one of the parties involved in the accident (Appellant) had left the scene on foot. Thereafter, he went in search of the party before going to the accident scene itself. The radio dispatcher informed him that the party was wearing blue jeans and no shirt, and had been last seen using a pay phone at a nearby "C-Mart" store. Upon arrival at the "C-Mart," McCall spotted a man, matching the dispatcher's description, using the pay phone.

As McCall approached the party, he asked him if he had been involved in an accident. The party responded that he had. Upon asking for identification, McCall learned it was Appellant. When asked why he left the scene of the accident, Appellant responded that he had no driver's license and was scared. At that point, McCall asked Appellant, "if you would, let's just go back to the scene of the accident." Before getting into the police car, Appellant asked McCall to retrieve a package that he had left on the pay phone. Upon retrieving the package, McCall discovered that it contained a six-pack of beer. Since Appellant had a strong odor of alcohol and appeared to have been drinking, McCall asked him when he had his last drink. Appellant responded that he had a Milwaukee's Best just prior to the accident.

Upon arrival at the accident scene, two bystanders immediately identified Appellant as the driver of the truck. McCall then arrested Appellant for DUI and read him his *Miranda* rights. On cross-examination, McCall conceded that once Appellant admitted he was in an accident, he was not free to leave and would have been placed under arrest if he refused to return to the accident scene. Defense counsel argued that

the incriminating statements made by Appellant at the "C-Mart" should be inadmissible since Appellant was in custody at the time they were taken, thus requiring *Miranda* warnings. The trial judge disagreed and ruled that there was no custodial interrogation requiring *Miranda* warnings. On appeal, Appellant asserts the trial judge erred in failing to suppress these statements.

## THE *MIRANDA* RULE

A statement, whether exculpatory or inculpatory, obtained as a result of custodial interrogation is inadmissible unless the person was advised of and voluntarily waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. (2d) 694 (1966).

The purpose of *Miranda* is to prevent "government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Arizona v. Mauro*, 481 U.S. 520, 529-530, 107 S.Ct. 1931, 1937, 95 L.Ed. (2d) 458 (1987).

### *Miranda* Warnings

A suspect in custody may not be subjected to interrogation unless he is informed that: he has the right to remain silent; anything he says can be used against him in a court of law; he has a right to the presence of an attorney; and, if he cannot afford an attorney, one will be appointed for him prior to any questioning, if he so desires. *Miranda v. Arizona, supra.*

It is sufficient if the warnings reasonably convey to a suspect his rights as required by *Miranda. Duckworth v. Eagan*, 492 U.S. 195, 109 S.Ct. 2875, 106 L.Ed. (2d) 166 (1989). A "talismanic incantation" is not required. *State v. Singleton*, 284 S.C. 388, 326 S.E. (2d) 153, *cert. denied*, 471 U.S. 1111, 105 S.Ct. 2346, 85 L.Ed. (2d) 863 (1985), *overruled in regard to the doctrine of in favorem vitae, State v. Torrence*, 305 S.C. 45, 406 S.E. (2d) 315 (1991) (omission of phrase "in court" did not render warning inadequate).

## *CUSTODY REQUIREMENT*

The seminal case in this country in regard to the applicability of *Miranda* to roadside questioning of motorists detained pursuant to a traffic stop is *Berkemer*

*v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed. (2d) 317 (1984). *Berkemer* explicates the law: "The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda.*" *Berkemer*, 468 U.S. at 440, 104 S.Ct. at 3150. To trigger the requirement of *Miranda* warnings, the suspect's "freedom of action [must be] curtailed to a 'degree associated with formal arrest.' " Whether the suspect is in custody depends on whether a reasonable person in the suspect's position would believe he was in custody. *Id.* at 440, 104 S.Ct. at 3150.

In *Pennsylvania v. Bruder*, 488 U.S. 9, 109 S.Ct. 205, 102 L.Ed. (2d) 172 (1988), the apppellate entity further elucidates *Miranda* in a routine traffic stop scenario:

> In *Berkemer v. McCarty, supra,* which involved facts strikingly similar to those in this case, the Court . . . reasoned that although the stop was unquestionably a seizure within the meaning of the Fourth Amendment, such traffic stops typically are brief, unlike a prolonged station house interrogation. Second, the Court emphasized that traffic stops commonly occur in the "public view," in an atmosphere far "less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda* itself." *Id.*, at 438-39, 104 S.Ct. 3138 [3149-50], 82 L.Ed. (2d) 317. The detained motorist's "freedom of action [was not] curtailed to 'a degree associated with formal arrest.' " *Id.*, at 440, 104 S.Ct. 3138 [3150], 82 L.Ed. (2d) 317 (citing *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517 [3520], 77 L.Ed. (2d) 1275 (1983). Accordingly, he was not entitled to a recitation of his constitutional rights prior to arrest, and his roadside responses to questioning were admissible.[1] (Footnote in original.)

> [1] We did not announce an absolute rule for all motorist detentions, observing that lower courts must be vigilant that police do not "delay formally arresting detained motorists, and . . . subject them to sustained and intimidating interrogation at the scene of their initial detention." *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed. (2d) 317 (1984).

The facts in this record, which Bruder does not contest, reveal the same noncoercive aspects as the *Berkemer* de-

tention: "a single police officer ask[ing] respondent a modest number of questions and request[ing] him to perform a simple balancing test at a location visible to passing motorists." 468 U.S. at 442, 104 S.Ct. 3138 [3151], 82 L.Ed. (2d) 317, (footnote omitted in original). Accordingly, *Berkemer's* rule, that ordinary traffic stops do not involve custody for purposes of *Miranda*, governs this case. (Footnotes omitted.)

*Bruder*, 488 U. S. at 10-11, 109 S.Ct. at 206-207.

The fact that the investigation has focused on the suspect does not trigger *Miranda* warnings unless he is in custody. *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed. (2d) 409 (1984).

Our Supreme Court in *State v. Morgan*, 282 S.C. 409, 319 S.E. (2d) 335 (1984), addressed the issue of routine questioning following a traffic accident:

The *Miranda* warnings are not required if the defendant is not in custody or significantly deprived of his freedom. *State v. Neeley*, 271 S.C. 33, 40, 244 S.E. (2d) 522, 526 (1978). When a defendant is not in custody or significantly deprived of his freedom, any inculpatory statements made at the time are not inadmissible because of the failure to give *Miranda* warnings. Defendant's view that he was deprived of his freedom is not sustained by the record. A traffic accident had just occurred. Dotson volunteered the information that he and the Defendant had seen the accident. What followed was a routine investigation into the cause. The statements by Defendant were made during the course of this routine investigation. *Miranda* warnings were not required. *Clay v. Riddle*, 541 F. (2d) 456 (4th Cir. 1976); *State v. Tabory*, 260 S.C. 355, 366, 196 S.E. (2d) 111, 114 (1973); *but see McCarty v. Herdman*, 716 F. (2d) 361 (6th Cir. 1983), *cert. granted*, 464 U.S. 1038, 104 S.Ct. 697, 79 L.Ed. (2d) (1984).[1] (Footnote in original.)

---

[1] "A person subjected to custodial interrogation is entitled to the benefit of procedural safeguards enunciated in *Miranda*. The roadside questioning of a motorist detained pursuant to a routine traffic stop does not constitute 'custodial interrogation' for the purpose of the *Miranda* rule." *Berkemer, Sheriff of Franklin County, Ohio v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed. (2d) 317 (1984).

*Morgan,* 282 S.C. at 411-412, 319 S.E. (2d) at 336.

*State v. Peele,* 298 S.C. 63, 378 S.E. (2d) 254 (1989), enunciates the efficacy of *Miranda* in regard to statements made at the scene of a traffic accident:

> In *Miranda,* the Supreme Court directed that a suspect was not to be subjected to "custodial interrogation" without first being advised of what are now commonly referred to as *"Miranda* rights." Custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Miranda, supra.* We have held that *Miranda* warnings are applicable only where there has been such a restriction on a person's freedom as to render him in custody. *State v. Morgan, supra; State v. Doby,* 273 S.C. 704, 258 S.E. (2d) 896 (1979).
>
> The question, then, is whether appellant was "in custody" at the time the sobriety tests were administered. This is the same question addressed by the United States Supreme Court in *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed. (2d) 317. (1984) and more recently in *Pennsylvania v. Bruder,* 488 U.S. 9, 109 S.Ct. 205, 102 L.Ed. (2d) 172 (1988). In *Berkemer,* the Supreme Court held that routine traffic stops do not constitute "custodial interrogation" for purposes of the *Miranda* rule. This holding was reiterated in the *Bruder* opinion, where the Court restated what it referred to as "Berkemer's rule"—that "ordinary traffic stops do not involve custody for purposes of *Miranda.*" 488 U.S. at 11-12, 109 S.Ct. at 207.

*Peele,* 298 S.C. at 65-66, 378 S.E. (2d) at 255-56.

### INTERROGATION

The special procedural safeguards outlined in *Miranda* are not required if a suspect is simply taken into custody, but only if a suspect in custody is subjected to interrogation. Interrogation is either express questioning or its functional equivalent. It includes words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to

elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed. (2d) 297 (1980); *See also State v. Franklin*, 299 S.C. 133, 382 S.E. (2d) 911 (1989).

■ *Miranda* warnings are inapplicable to volunteered statements which are not the product of interrogation. *State v. Howard*, 296 S.C. 481, 374 S. E. (2d) 284 (1988).

■ The totality of circumstances surrounding Officer Mc-Call's questioning of Appellant at the "C Mart" did not create a "custodial interrogation." McCall, who knew no details of the accident, questioned Appellant as a means to determine what had happened, not to gather information to incriminate Appellant. Appellant's responses concerning his drinking and lack of a driver's license were voluntarily given to McCall in response to routine, investigatory questions. Further, Appellant's request for McCall to retrieve his package of beer was not even responsive to a question by McCall, but was merely a spontaneous statement by Appellant.

Admittedly, although the police officers at the scene of the accident testified that Appellant was not under "arrest" at the time he made statements, the officers did state that if Appellant had attempted to flee the scene of the accident he would have been chased and was not free to leave after he told the police officer "that he had been involved in an accident. . . ." However, at the time the statements were made, Appellant was not in custody. Furthermore, as previously stated, the questions which the police officer asked Appellant were pursuant to a routine investigation of a traffic accident. Appellant voluntarily gave his statements in response to these general questions.

■ Our review of the issue of custody is limited to a determination of whether the ruling by the trial court is supported by the testimony. *See State v. Primus*, 312 S.C. 256, 440 S.E. (2d) 128 (1994) (whether appellant was "in custody" presents a factual issue that cannot be resolved by this Court). We conclude that Appellant was not in custody at the time he gave the statements in question.

Since Appellant was not in custody or under arrest when Officers questioned him about the accident, no *Miranda* warnings were required. Therefore, the trial judge did not err in allowing testimony concerning Appellant's statements to the officers.

Assuming *arguendo* that the Appellant was in custody at the time he gave the statements and *Miranda* warnings were required, the record contains overwhelming evidence of Easler's guilt independent of his statements to Officer McCall. *Cf. State v. Newell*, 303 S.C. 471, 410 S.E. (2d) 420 (Ct. App. 1991) (although the trial judge erred in not suppressing Sergeant Canty's testimony regarding Newell's in-custody statements because of his failure to advise Newell of her rights under *Miranda*, the Court deemed the admission of this testimony harmless beyond a reasonable doubt); *State v. Kelley*, — S.C. —, 460 S.E. (2d) 368 (1995) (when guilt is conclusively proven by competent evidence, such that no other rational conclusion could be reached, this Court will not set aside a conviction for insubstantial errors not affecting the result); *State v. Rochester*, 301 S.C. 196, 391 S.E. (2d) 244 (1990) (the admission of improper evidence is harmless where the evidence is merely cumulative); *State v. Bernotas*, 277 S.C. 106, 283 S.E. (2d) 580 (1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed. (2d) 134 (1982) (the challenged evidence did not prejudice the appellant because it was merely cumulative to independent and overwhelming evidence of guilt); *State v. Blackburn*, 271 S.C. 324, 247 S.E. (2d) 334 (1978) (the improper admission of a witness's statement implicating the appellant was harmless because it was cumulative to testimony from other State witnesses); *People v. Cagle*, 158 A.D. (2d) 931, 551 N.Y.S. (2d) 95 (1990) (the admission of the defendant's statements obtained in violation of *Miranda* held harmless beyond a reasonable doubt because the evidence of the defendant's guilt was overwhelming and the testimony of both the defendant and his witness was essentially the same as the defendant's statement); *People v. Scharle*, 14 Ill. App. (3d) 511, 302 N.E. (2d) 663 (1973) (the admission of the defendant's statements given without the benefit of the *Miranda* warnings held harmless beyond a reasonable doubt where the conviction for driving a vehicle while under the influence of intoxicating liquor rested upon other evidence).

## *BATSON*

Appellant asserts the trial judge erred in quashing the first jury panel after finding Appellant exercised his peremptory challenges in a racially discriminatory manner. We disagree.

During the selection of the jury, the defense exercised four of its ten peremptory strikes against black venire members. A hearing pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. (2d) 69 (1986), was held *in camera*. The four jurors at issue in the *Batson* hearing were Juror No. 25 (Shannon Dawkins—a black male), Juror No. 101 (Travis Bonner—a black male), Juror No. 11 (Betty Bonner—a black female), and Juror No. 47 (Thomas Hardy—a black male). The following colloquy occurred:

> THE COURT: I find that the victims in this matter are of a minority race. And, of course, the right does inure to that of the juror as opposed to the victim or the defendant. But I believe the State is entitled to a racially neutral reason from the defense for those strikes.
>
> Mr. Dawkins first.
>
> MR. SHEALY: Your Honor, I'm going to have a tough time remembering each one of these. But as far as how I challenged the jurors—
>
> THE COURT: We—
>
> MR. SHEALY: Mr. Dawkins, if I recall, was—all I have to go is his appearance. He was young. He—he was not within the sort of thing that—the sort of profile that we were looking for in a juror.
>
> THE COURT: Tell me what the profile was then.
>
> MR. SHEALY: The profile I was looking for, Your Honor, was a middle aged person, someone that's had some experience that—I could care less if they were white of black. That had—would be willing to stand, listen to the evidence, had the maturity of foresight to listen to the evidence, determine what was true and what's not true. And that's what I based—
>
> I looked at Mr. Dawkins, discussed it with my colleagues, and we determined that we did not choose to seat him as a juror.
>
> THE COURT: How old was Mr. Dawkins?
>
> MR. SHEALY: He's—I believe he's twenty years old, Your Honor.
>
> THE COURT: Do you have any twenty year old jurors that wasn't stricken, such as Ms. Gann, a white female, first alternate? I don't know what age she is, but she looked to be in that age range.

MR. SHEALY: Well, Your Honor, I didn't keep track of everybody that I struck.

THE COURT: These kind of motions coming in the future, you need to make sure that you do.

MR. SHEALY: Yes, Your Honor.

THE COURT: You put this court in quite a, you know, situation of almost having to summarily rule against you if you can't give me any reason, because that's what the law requires.

MR. SHEALY: Well—

THE COURT: The case law requires some racially neutral reason being given. And if all you can say is I don't remember why I did it, or we just didn't like the way they walked up there, or something, that's not going to fly.

MR. SHEALY: Well, Your Honor, if I could have a moment. I discussed that—

THE COURT: Why don't you discuss—

You have got four. Why don't you just take a few minutes and look over it.

\*　\*　\*　\*　\*

THE COURT: As to your first proposition, that age was a factor, I can't find that that's acceptable. The next person that sat was twenty-two, a white male. Farley was twenty-seven, white female. Dowdle was twenty-one. Ms. Gann was twenty, Mr. Cagle is twenty-nine. So you let a fair number of white jurors, male and female, in that same age bracket. I can't find that was racially neutral.

After the trial court stated that it had found that the defense's reasons for striking Juror No. 25 (Mr. Shannon Dawkins) were not race-neutral, defense counsel attempted to "backtrack" and stated, "Your Honor, we would submit that education is a maturity accelerant, and that through education jurors are much more likely to be independent and be able to be better judge of what's presented before them." The following colloquy then occurred:

THE COURT: How can Mr.—what's the difference in two years with Mr. Dawkins and Mr. Wagstaff or one year between Ms. Dowdle and Mr. Dawkins. How much more experienced is Ms. Dowdle after one year than Mr. Dawkins

was? How can you gauge that?

MR. SHEALY: Well, I don't know that you can, Your Honor. You can do the best you can when somebody walks up in front of you.

And in this situation, the overall person Mr. Dawkins is twenty-five years old. He's—I'm sorry, he's twenty years old. We don't know what his education was, or how far he got. I looked at him. I determined from their demeanor whether or not they would be sympathetic to my client.

There is a—there is a concern about race here, Your Honor, but that was not the basis.

THE COURT: That's what I'm asking, is what is the racially neutral basis? You have got to show me one that you used that doesn't apply elsewhere. What kind of education does Mr. Wagstaff have? You sat him, the next juror, twenty-two years old, white male. Didn't have any trouble with him. What's the difference in those two?

*Batson* prohibits the exercise of peremptory challenges in a racially discriminatory manner.

The *in camera* hearing was conducted by the trial court pursuant to *State v. Chapman*, 317 S.C. 302, 454 S.E. (2d) 317 (1995). *Chapman* instructs:

> The United States Supreme Court subsequently found in *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed. (2d) 411 (1991), that *Batson* was designed to serve multiple ends, only one of which was to protect individual defendants from discrimination in the selection of jurors. The *Powers* Court recognized that *Batson* also provided each individual juror equal protection rights not to be excluded from the jury. Therefore, the Court reasoned that in a trial of a white criminal defendant, a prosecutor is prohibited from excluding black jurors based on race.

* * * * *

The Supreme Court next held that a criminal defendant's use of peremptory challenges was state action. Therefore, a criminal *defendant's* racially discriminatory exercise of peremptory challenges inflicts the harms addressed by *Batson. Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed. (2d) 33 (1992). Individual juror's

rights to nondiscriminatory jury selection were further strengthened by the Supreme Court's decision in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. —, 114 S.Ct. 1419, 128 L.Ed. (2d) 89 (1994). *J.E.B.* found that discrimination in jury selection, whether based on race or on gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process. Consequently, gender, like race, was an unconstitutional proxy for juror competence and impartiality.

\* \* \* \* \*

Currently, trial judges are given the discretion to determine whether the defendant has made out a *prima facie* showing of purposeful discrimination. *State v. Jones*, 293 S.C. 54, 358 S.E. (2d) 701 (1987). . . .

Considering the United States Supreme Court's development of the issue, the *Jones* criterion as to when to hold a *Batson* hearing is outdated. However, this Court's concern about ensuring consistency is still legitimate. Therefore, we require that trial courts hold *Batson* hearings whenever one is requested. In our opinion, requesting a *Batson* hearing in effect sets out a *prima facie* case of discrimination. We note that under the guidelines as set forth by the U.S. Supreme Court, any person regardless of race or gender may set forth a valid *Batson* claim. Likewise, the striking of any juror can raise the inference of race and/or gender based discrimination. As a result, past distinctions of whether one is a member of a cognizable group are no longer applicable. (Footnote omitted.)

*Chapman*, 454 S.E. (2d) at 319-320.

"Whether a proffered reason is racially neutral is to be determined by examining the totality of the facts and circumstances in the record surrounding the strike, including the credibility and demeanor of the individual called upon to explain her strike." *State v. Donald Kelley*, 319 S.C. 173, 176, 460 S.E. (2d) 368, 370 (1995) (citing *Riddle v. State*, 314 S.C. 1, 443 S.E. (2d) 557 (citations omitted), *cert. denied*, — U.S. —, 115 S.Ct. 518, 130 L.Ed. (2d) 424 (1994)).

In *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed. (2d) 33 (1992), the United States Supreme Court ex-

tended the auspices of *Batson* and concluded that the Equal Protection Clause prohibited criminal *defendants* from engaging in purposeful discrimination on grounds of race in exercising peremptory challenges. However, the fact that a party proposes a racially neutral reason for striking a juror does not necessarily mean that the striking of the juror would withstand the *Batson* challenge. "A racially neutral reason . . . can be negated [by] showing that the [party] created a pretext for purposeful discrimination by applying his allegedly racially neutral standard in a discriminatory manner." *Riddle*, 314 S.C. 1, 14, 443 S.E. (2d) 557, 565 (1994). In *State v. Oglesby*, 298 S.C. 279, 379 S.E. (2d) 891 (1989), the solicitor claimed that he had struck three black females from the jury panel because they were patients of a doctor who was a defense witness. However, the solicitor had seated a white female as a juror who was also a patient of the doctor. In opining that the solicitor had violated *Batson v. Kentucky*, the South Carolina Supreme Court stated that "[i]n this case, an examination of the circumstances shows that the solicitor's originally neutral reason was proven to be a pretext because it was not applied in a neutral manner." *Id.* at 281, 379 S.E. (2d) 892. Because the solicitor struck black females based upon a characteristic which a white female, whom he seated as a juror, also possessed, the appellant's conviction in *Oglesby* was reversed and remanded for a new trial. Furthermore, the Court stated that if a party was "allowed to prevail despite the application of such blatantly inconsistent standards, *Batson* would be left without substance." *Id.*

In the case at bar, the Court is presented with a situation amazingly analogous to the facts in *Oglesby*.

The trial judge did not err in finding that Appellant was unable to articulate a racially neutral explanation for his peremptory challenges against black venire persons. Here, defense counsel initially asserted that he struck Mr. Dawkins because of his age. However, age cannot be considered a racially neutral explanation for the striking of Mr. Dawkins since Appellant failed to strike several white venire persons in the same age bracket. *Cf. State v. Oglesby, supra* (a prosecutor's asserted reason for excluding prospective jurors of one race is a pretext for racial discrimination in light of a failure to strike jurors of another race who differed in no sig-

nificant way from the jurors who were excused).

■ After the trial judge refused to accept age as a racially neutral explanation, he gave defense counsel a few moments to review his decision. Thereafter, defense counsel claimed he struck Mr. Dawkins because of his demeanor. While demeanor can be considered a racially neutral explanation,[1] defense counsel never pointed out any specific examples of why he disliked Mr. Dawkins' demeanor, despite having the opportunity to do so. Considering that defense counsel first failed to articulate a racially neutral explanation for Mr. Dawkins' strike, and then subsequently asserted in general terms without elaboration that he disliked Mr. Dawkins' demeanor, the trial judge did not err in granting the State's *Batson* motion. *See Sumpter v. State,* 312 S.C. 221, 439 S.E. (2d) 842 (1994) (the trial judge's findings of purposeful discrimination rest largely on his evaluation of demeanor and credibility, and the reviewing court should give the findings great deference on appeal).

Next, *State v. Franklin,* — S.C. —, 456 S.E. (2d) 357, *cert. denied,* — U.S. —, 116 S.Ct. 160, 133 L.Ed. (2d) 103 (1995), identifies the procedure to be used by the trial judge in the event of a *Batson* violation:

> *Batson* specifically left the remedy for striking a juror based upon race to each state. *Id.* at 99, n. 24, 106 S.Ct. at 1724-25, n. 24, 90 L.Ed. (2d) at 90, n. 24. South Carolina first addressed the remedy for *Batson* violations in *State v. Jones,* 293 S.C. 54, 358 S.E. (2d) 701 (1987). In *Jones,* we held that when the solicitor violates *Batson,* "the jury shall be quashed and the process of selecting the jury shall start *de novo.*" *Id.* at 58, 358 S.E. (2d) at 704. *Jones* recognized that "members of the tainted jury and all persons who were struck" may be placed back in the jury venire. *Id.* at 58, n. 3, 358 S.E. (2d) at 704, n. 3.

*Franklin,* 456 S.E. (2d) at 359.

In the case *sub judice,* the trial court followed the mandate of *Franklin* in the drawing of the new jury.

Finally, *State v. Adams,* 322 S.C. 114, 470 S.E. (2d) 366 (1996), is the latest pronouncement by our Supreme Court on

---

[1] Counsel may strike venire persons based on their demeanor and disposition. *State v. Wilder,* 306 .C. 535, 413 S.E. (2d) 323 (1991).

*Batson. Adams* edifies:

To date, we have interpreted *Batson* to require the party that exercised the peremptory challenges at issue to present an explanation that is racially neutral, clear and reasonable specific, and legitimate. *E.g., State v. Tomlin,* 299 S.C. 294, 384 S.E. (2d) 707 (1989); *see also State v. Green,* 306 S.C. 94, 409 S.E. (2d) 785 (1991) (articulating test), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1566, 118 L.Ed. (2d) 212 (1992). If the explanation does not satisfy these criteria, the trial judge may find a violation and throw out the jury panel. If, however, the explanation meets these criteria, the opponent of the strike then bears the burden of proving that the allegedly neutral explanation is pretextual. *E.g., Sumpter v. State,* 312 S.C. 221, 439 S.E. (2d) 842 (1994). Generally, one shows pretext by demonstrating that similarly situated jurors of other races were seated. *Id.* Moreover, the trial court's findings regarding purposeful discrimination are entitled to great deference and are to be set aside only if clearly erroneous. *State v. Dyar,* 317 S.C. 77, 452 S.E. (2d) 603 (1994).

Recently, however, in *Purkett v. Elem,* — U.S. —, 115 S.Ct. 1769, 131 L.Ed. (2d) 834 (1995), the United States Supreme Court adopted a slightly altered procedure for the second step of the *Batson* analysis. Under *Purkett,* the proponent of the peremptory challenges will not have any burden of presenting reasonably specific, legitimate explanations for the strikes. Instead, it need only present racially neutral explanations:

"The second step of this process does not demand an explanation that is persuasive, or even plausible. . . . It is not until the third step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination. At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination. But to say that a trial judge may choose to disbelieve a silly or superstitious reason at step 3 is quite different from saying that a trial judge must terminate the inquiry at step 2 when the race-neutral reason is

silly or superstitious. The latter violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Id.* at —, 115 S.Ct. at 1771, 131 L.Ed. (2d) at 839 (citations omitted). Once a racially neutral explanation is given, the party challenging the strikes must show the explanation is mere pretext for racial discrimination. *Id.*

We take this opportunity to adopt the standard delineated in *Purkett.* Under this new test, the party opposing the strikes will make a case of prima facie discrimination in the same manner as before. In other words, pursuant to *State v. Jones,* 293 S.C. 54, 358 S.E. (2d) 701 (1987), the trial judge must hold a *Batson* hearing when members of a cognizable racial group or gender are struck and the opposing party requests a hearing. The second step of the analysis, however, will require only a race-neutral explanation by the proponent of the strike. In the third step, the opponent of the strike must show that the race-neutral explanation given was mere pretext. As before, pretest generally will be established by showing that similarly situated members of another race were seated on the jury. *See Sumpter v. State,* 312 S.C. 221, 439 S.E. (2d) 842 (1994). Under some circumstances, the race-neutral explanation given by the proponent may be so fundamentally implausible that the judge may determine, at the third step of the analysis, that the explanation was mere pretext even without a showing of disparate treatment. We note that this new test does not vitiate *Batson,* because we retain our current approach to the first and third prongs of the *Batson* analysis. The *Purkett* approach simply returns to the opponent of the strike the ultimate burden of showing purposeful discrimination.

Analyzing the instant case under *Adams,* the opponent of the strike met the ultimate burden of showing purposeful discrimination.

### CHANGE OF VENUE

Appellant asserts the trial judge erred in denying his motion for a change of venue due to pretrial publicity. We disagree.

Before trial, defense counsel made a motion for a change of venue due to pretrial publicity. He included as an exhibit several newspaper articles that has recently appeared in local newspapers recounting the accident and its effect on the victim's family.

During jury selection, the trial judge asked all persons who had heard anything about the case from any source whatsoever to stand. After several venire persons stood, the trial judge questioned the source of the information. Thereafter, the trial judge asked those who had just stood, along with the rest of the jury panel, whether anyone had already formed any opinion as to the guilt or innocence of Appellant. No one responded affirmatively.

A few moments later, the trial judge again asked the jury panel as a whole if they could provide Appellant a fair and impartial trial. After no one responded negatively, the trial judge asked all those who had heard pretrial publicity concerning the case to stand. The trial judge then individually questioned all those standing with the following question:

> I'm going to ask each of you individually to respond, just like we did a monent ago. And the question is, can you and can each of you set aside such information as you have received prior to the date of this trial, from any source whatsoever, and setting aside such information render a fair and impartial verdict based solely on the law and the evidence as received during the trial of this case? If you can, answer yes. If you can't, answer no.

One person responded, "no," and another, "I'm not sure." Both were excused from service.

Thereafter, defense counsel repeated his request for a change of venue. The trial judge denied the motion. Later, the trial judge again questioned the jury panel to determine if any member could not be fair and impartial. Subsequently, a jury was chosen. On appeal, Appellant asserts the trial judge erred in denying his motion for a change of venue.

Issues encapsulated in a change of venue motion are addressed with certitude in *State v. Caldwell*, 300 S.C. 494, 388 S.E. (2d) 816 (1990):

> A motion for change of venue is addressed to the sound discretion of the trial judge and will not be disturbed ab-

sent an abuse of discretion. *State v. Copeland,* 278 S.C. 572, 300 S.E. (2d) 63 (1982), *cert. denied, Roberts v. South Carolina,* 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed. (2d) 1399 (1983). When a trial judge based the denial of a motion for a change of venue because of pretrial publicity upon an adequate voir dire examination of the jurors, his decision will not be disturbed absent extraordinary circumstances. *State v. Thompson,* 278 S.C. 1, 292 S.E. (2d) 581 (1982), *cert. denied,* 456 U.S. 938, 102 S.Ct. 1996, 72 L.Ed. (2d) 458 (1982). Mere exposure to pretrial publicity does not automatically disqualify a prospective juror. *State v. Ayers,* 284 S.C. 266, 325 S.E. (2d) 579 (Ct. App. 1985). When jurors have been exposed to such publicity, a denial of a change of venue is not error where jurors are found to have the ability to lay aside any impressions or opinions and render a verdict based on the evidence presented at trial. *Id.* It is the defendant's burden to demonstrate actual juror prejudice as a result of such publicity. *State v. Goolsby,* 275 S.C. 110, 268 S.E. (2d) 31 (1980), *cert. denied,* 449 U.S. 1037, 101 S.Ct. 616, 66 L.Ed. (2d) 500 (1980).

*Caldwell,* 300 S.C. at 502, 388 S.E. (2d) at 820-821.
*See also State v. Longworth,* 313 S.C. 360, 438 S.E. (2d) 219 (1993), *cert. denied,* — U.S. —, 115 S.Ct. 105, 130 L.Ed. (2d) 53 (1994) (a motion for change of venue is addressed to the sound discretion of the trial judge, and his ruling will not be disturbed absent an abuse thereof; further, it is the defendant's burden to demonstrate actual juror prejudice as a result of pretrial publicity).

If a change of venue is sought on the basis of pretrial publicity, the general practice is to postpone ruling on that motion until the jury panel is voir dired. *See State v. Fowler,* 266 S.C. 203, 222 S.E. (2d) 497 (1976); *See also State v. Crowe,* 258 S.C. 258, 188 S.E. (2d) 379, *cert. denied,* 409 U.S. 1077, 93 S.Ct. 691, 34 L.Ed. (2d) 666 (1972).

Even if the jurors are aware of the publicity, venue need not be changed if the jurors state they are able to lay aside their outside knowledge and decide the case on the evidence presented at trial. *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed. (2d) 751 (1961); *State v. Fowler, supra; State v. Ayers,* 284 S.C. 266, 325 S.E. (2d) 579 (Ct. App. 1985).

The trial judge did not err in denying Appellant's motion for a change of venue.

## DOUBLE JEOPARDY

Appellant asserts his Fifth Amendment right against multiple punishments for the same offense was violated by his convictions for felony DUI causing death along with reckless homicide, and felony DUI causing great bodily injury along with ABHAN. We disagree.

As a result of Appellant's driving a truck while intoxicated across the center line of the road, Ms. Roberts was severely injured and her son, Cornelius, was killed. Among other things, Appellant was found guilty of felony DUI causing death and reckless homicide for the death of Cornelius, and felony DUI causing great bodily injury and ABHAN for the injuries suffered by Ms. Roberts. Before sentencing, defense counsel made a motion to dismiss the verdicts of reckless homicide and ABHAN. He argued that punishments for reckless homicide and felony DUI causing death, which both resulted from Cornelius's death, subjected him to double jeopardy for the same offense. He made the same argument concerning the punishments for ABHAN and felony DUI causing great bodily injury, which both resulted from Ms. Roberts' severe injuries. Defense counsel suggested that the trial judge could solve the problem by doing the following:

> [I]n the alternative, Your Honor, we would argue that one way to handle it would be to sentence him concurrently on those particular charges.
>
> ... as far as the significant charges here, that since it was one driving, one episode, one collision, that all sentences, in good conscious [sic], must be set to run concurrent.

On appeal, Appellant asserts these convictions violate the Double Jeopardy Clause by subjecting him to multiple punishments for the same offense.

The Double Jeopardy Clause of the Fifth Amendment " 'protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same office.' " *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed. (2d) 187 (1977) (cit-

ing *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed. (2d) 656 (1969) (Footnotes omitted in original)). "Where consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." *Brown*, 432 U.S. at 165, 97 S.Ct. at 2225.

The established test for determining whether two offenses are the same was set out in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932):

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not. *Gavieres v. United States*, 220 U.S. 338, 342, 31 S.Ct. 421 [422], 55 L.Ed. 489, 490 [(1911)], and authorities cited. In that case this court quoted from and adopted the language of the Supreme Court of Massachusetts in *Morey v. Com.*, 108 Mass. 433 [(1871)]: " 'A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not exempt the defendant from prosecution and punishment under the other.' "

*Blockburger*, 284 U.S. at 304, 52 S.Ct. at 182.

The *Blockburger* test "emphasizes the elements of the two crimes." *Brown*, 432 U.S. at 166, 97 S.Ct. at 2226. " 'If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes. . . .' "*Id.* (citing *Ianneli v. United States*, 420 U.S. 770, 785, n. 17, 95 S.Ct. 1284, 1293, n. 17, 43 L.Ed. (2d) 616 (1975)).

The circuitous and serpentine history of *Blockburger* is articulated with clarity and exactitude in *State v. Lewis*, 321 S.C. 146, 467 S.E. (2d) 265 (Ct. App. 1996):

> A defendant may be severally indicted and punished for separate offenses without being placed in double jeopardy where a single act consists of two "distinct" offenses. *State v. Walsh*, 300 S.C. 427, 388 S.E. (2d) 777 (1988). In *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084,

109 L.Ed. (2d) 548 (1990), the United States Supreme Court set forth the following analysis for determining whether a subsequent prosecution was barred by the double jeopardy clause. The court had to first apply the traditional test under *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), which requires a technical comparison of the elements of the offense for which the defendant was first tried with the elements of the offense in the subsequent prosecution. If the *Blockburger* test revealed that the offenses had identical statutory elements or that one was a lesser included offense of the other, then the inquiry must cease and the subsequent prosecution was barred. *Id.* If, however, a subsequent prosecution survived this technical comparison of the elements of the two offenses, the court had to then determine whether the State would prove the entirety of the conduct previously prosecuted to establish an essential element of the offense in the subsequent prosecution. If so, the subsequent prosecution was barred. *Id.* The *Grady v. Corbin* analysis relied on a determination of whether one offense was a "species of lesser-included offense" of the other. See *State v. Wilson*, 311 S.C. 382, 429 S.E. (2d) 432 (1993) (discussing and applying the *Grady v. Corbin* analysis).

*Grady v. Corbin* was overruled, however, in *United States v. Dixon*, 609 U.S. 688, 113 S.Ct. 2849, 125 L.Ed. (2d) 556 (1993). A majority of the United States Supreme court found *Grady's* "same conduct" test lacked constitutional roots, and was wholly inconsistent with Supreme Court precedent and "the clear common-law understanding of double jeopardy." *United States v. Dixon*, 509 U.S. at 688, 113 S.Ct. at 2860. Accordingly, *Grady* is no longer the law, and *Blockburger* remains as the only test of double jeopardy for successive prosecutions as well as for multiple punishments in a single prosecution. *See generally* McAninch, *Double Jeopardy: The Basics for Practitioners*, Criminal Practice Law Report, April and May 1994 (two parts).

*Lewis*, 467 S.E. (2d) at 266-67.

First, Appellant asserts the trial court erred by allowing Appellant to receive punishments for both reckless homicide and felony DUI causing death since both offenses arose from the accident causing the death of Cornelius Roberts. We disagree.

Reckless homicide occurs "[w]hen the death of any person ensues within one year as a proximate result of injury received by the driving of any vehicle in reckless disregard of the safety of others. . . ." S.C. Code Ann. § 56-5-2910 (Supp. 1994).

The elements of felony DUI causing death are stated in *State v. Cribb*, 310 S.C. 518, 523, 426 S.E. (2d) 306, 309 (1992) (citing *State v. Grampus*, 288 S.C. 395, 397, 343 S.E. (2d) 26, 27 (1986)). *See also* S.C. Code Ann. § 56-5-2945 (Supp. 1994).

Felony DUI requires proof of three elements:

1) the actor drives a vehicle while under the influence of alcohol and/or drugs;
2) the actor does an act forbidden by law or neglects a duty imposed by law; and
3) the act or neglect proximately causes great bodily injury or death to another person.

Reckless homicide is not a lesser-included offense of felony DUI causing death, but is a distinct offense requiring proof of different elements. *State v. Cribb, supra.* "A lesser included offense is one that requires no proof beyond that which is required for conviction of the greater offense." *State v. Cribb,* 310 S.C. at 523, 426 S.E. (2d) at 309 (citing *State v. Dobson,* 279 S.C. 551, 309 S.E. (2d) 752 (1983)). "The greater offense must include all the elements of the lesser." *Id.* at 523, 426 S.E. (2d) at 309. Felony DUI causing death does not contain all the elements of reckless homicide. Specifically, reckless homicide requires a proof of recklessness, while felony DUI causing death does not. *See State v. Cribb, supra.*

Because reckless homicide requires proof of facts not required in the proof of felony DUI causing death, the *Blockburger* "same offense" test is not satisfied. Therefore, the trial court did not err in sentencing the Appellant for both offenses.

Furthermore, in *State v. Carter,* 291 S.C. 385, 353 S.E. (2d) 875 (1987), our Supreme Court amplified the issue:

It is fundamental that a single criminal transaction may constitute multiple distinct offenses for which one may be severally punishable. *State v. Norton*, 286 S.C. 95, 332 S.E. (2d) 531 (1985). We are not, by this opinion, foreclosing the possibility that a person may be convicted of both DUI and reckless homicide arising out of the same incident. To the contrary, both offenses could have been tried together in General Sessions Court and a conviction might have been sustained. We hold only that appellant's substantial claim of double jeopardy prohibits his subsequent prosecution for reckless homicide because the state relied on and proved the same facts of the adjudicated DUI offense to establish the reckless act necessary to prove reckless homicide. *State v. Grampus, supra*; and *Illinois v. Vitale, supra* [447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed. (2d) 228 (1980)].

*Carter*, 291 S.C. at 388-89, 353 S.E. (2d) at 876-77.

Second, Appellant contends the trial court erred in allowing him to be punished for both ABHAN and felony DUI causing great bodily injury since both offenses arose from the accident that injured Ms. Roberts. We disagree.

The most recent instruction on the law of ABHAN in *State v. Pilgrim*, 320 S.C. 409, 465 S.E. (2d) 108 (Ct. App. 1995) (citing *State v. Jones*, 133 S.C. 167, 130 S.E. 747 (1925)).

Assault and battery of a high and aggravated nature is the unlawful act of violent injury to another accompanied by circumstances of aggravation. Circumstances of aggravation include the use of a deadly weapon, infliction of serious bodily injury, the intent to commit a felony, and the purposeful infliction of shame and disgrace.

*Pilgrim*, 464 S.E. (2d) at 111.

Juxtaposing the offenses of ABHAN and felony DUI causing great bodily injury under the elemental test of *Blockburger*, felony DUI causing great bodily injury requires proof of intoxication; whereas ABHAN does not require such proof. Therefore, felony DUI causing great bodily injury and ABHAN do *not* satisfy the "same elements" test under *Blockburger*.

Since felony DUI causing great bodily injury requires proof of facts not required in the proof of ABHAN, the trial court did not err in sentencing Appellant for both offenses.

### DENIAL OF OPPORTUNITY TO PLEAD GUILTY

During the presentation of the State's case, Appellant offered to plead guilty to leaving the scene of an accident, driving under suspension, felony DUI causing great bodily injury, and felony DUI causing death.

The State argued the Appellant was merely trying to plead guilty to the lesser charges in an attempt to preclude the State under the Double Jeopardy Clause from continuing with the charges of murder and assault and battery with intent to kill. The trial judge refused to accept Appellant's guilty pleas out of concern that double jeopardy may preclude the State from proceeding with their other charges. On appeal, Appellant asserts the trial judge erred.

"[I]t is the prerogative of any person to waive his rights, confess, and plead guilty, under judicially defined safeguards, which are adequately enforced." *State v. Armstrong*, 263 S.C. 594, 597, 211 S.E. (2d) 889, 890 (1975). However, an appellant has no constitutional right to plea. *Cf. State v. Chisolm*, 312 S.C. 235, 439 S.E. (2d) 850 (1994) (solicitor not required to plea bargain with appellant charged with murder when appellant wishes to plead to voluntary manslaughter). Furthermore, "[w]hen an accused is indicted on several counts, one of which might bar prosecution of the others should the accused plead guilty to that count, the trial judge is not required to accept the plea." *State v. Whitted*, 279 S.E. 260, 262-63, 305 S.E. (2d) 245, 247 (1983). *See also State v. Truesdale*, 278 S.C. 368, 296 S.E. (2d) 528 (1982) ("Pleas of guilty are unconditional, and if an accused attempts to attach any condition or qualification thereto, the trial court should direct a plea of not guilty.").

Further, no constitutional impediment exists in a trial judge's refusal to accept a defendant's guilty plea since the result of his refusal is that the accused is subject to a trial by an impartial jury, which is a constitutional guarantee. U.S. Const. art. III, § 2; S.C. Const. art. I, § 14.

There is no merit in Appellant's position in regard to the refusal by the trial court to accept his proffered pleas.

Accordingly, for the reasons stated, the convictions and sentences of Kenneth Wayne Easler are

Affirmed.

CURETON and GOOLSBY, JJ., concur.