541 S.E.2d 852

**The STATE, Appellant,**

**v.**

**Florence Robinson EVANS, Respondent.**

**No. 3276.**

Court of Appeals of South Carolina.

Heard Oct. 10, 2000.

Decided Jan. 2, 2001.

Rehearing Denied March 12, 2001.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney Generals Donald J. Zelenka and David K. Avant, and Assistant Attorney General S. Creighton Waters, all of Columbia, for appellant.

Senior Assistant Appellate Defender Wanda H. Haile, of SC Office of Appellate Defense, of Columbia, for respondent.

CURETON, Judge:

A Chesterfield County grand jury indicted Florence Robinson Evans for the murder of her three children.[1] At a pretrial hearing, the trial court suppressed Evans's oral and written confessions. The State appeals. We reverse and remand.

## FACTS

On the morning of March 4, 1994, a fire destroyed the Pageland trailer-home of Evans and killed her three small children. Evans survived as she was visiting her sister's nearby home at the time of the fire. Later that day, arson investigator Terry Alexander of the South Carolina Law Enforcement Division (SLED) obtained Evans's permission to search the burned-out trailer, but she refused to give Alexander a written statement. An initial test of the site revealed the presence of a flammable substance in the debris. Samples

---

1. Throughout the record, the defendant is referred to as both Florence Evans and Florence Robinson. For the sake of clarity, Evans is used exclusively in this opinion.

were collected for later analysis at SLED's laboratory to determine the type of accelerant present at the commencement of the fire.

Agent Alexander did not return to Pageland until after the children's funerals. Around lunchtime on March 14, 1994, he attempted to contact Evans at the home of her cousin where she had been staying since the fire, but Evans was not there. He left word with an occupant of the house to ask Evans to "come to the Pageland Police Department for the purposes [sic] of talking to me about the fire." Between 3:00 and 4:00 p.m, Evans's cousin, Inez Robinson, drove Evans to Pageland's police station.[2] Alexander and his supervisor, SLED Lieutenant Doug Ross, escorted Evans back to a detective's office in the station which they had borrowed to conduct the interview. Robinson and several other family members who had accompanied Evans to the station were left in the station's waiting room. Robinson asked if she could accompany Evans because "she's quiet," and Robinson wanted to be with her, but the officers refused.

Once inside the detective's small office, Evans agreed to talk with Agent Alexander and Lt. Ross. She told them that on the morning of the fire, she arose just before 9:00 a.m., lit a kerosene heater, then left her children asleep in the trailer while she went next door to visit her sister. Minutes after her arrival, Evans's sister said she smelled smoke, so Evans looked out the window and saw her trailer in flames. Evans testified that she rushed back to the trailer and attempted to gain entry, but was barred by the flames. When asked what caused the fire, Evans opined that it could have been caused by either dogs under the trailer, her sister's son playing with matches, or a faulty electrical outlet. During the interview, Alexander took notes on a "Voluntary Statement" form, but he neither asked Evans to read the form nor advised her of the *Miranda* [3] rights contained thereon.

---

**2.** Inez Robinson is married to Evans's first cousin; she raised Evans and her siblings after their mother died. At the hearing, Robinson testified she took Evans to the police station after Evans told her "the law" was looking for her.

**3.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Agent Alexander testified that although Evans was "very cooperative" during the interview, she was also upset and sobbing. At times, Evans would speak so softly that Alexander could barely understand her. She would also clutch the agent's hands and ask him for help. Although Alexander repeatedly asked her what type of help she required, Evans never responded with a specific request. Alexander testified that he felt the interview was very unproductive and tried to end it on several occasions, but claimed that Evans would respond with tears and repeat her request for help.

Lieutenant Ross confirmed Alexander's account of the interview. He testified that "the interview seemed to be—you know—basically no help at all" and "was a very long drawn out event" which lasted two or three hours. Ross also claims to have been unsuccessful in ending the interview.

After more than an hour of questioning, the two agents stepped into the hall outside the interview room to confer about Evans's statement. Ross testified that he suggested to agent Jennifer Edwards of SLED's child fatality unit to "go in and talk to [Evans], see if [Edwards] could—you know—get anything different than we already had." Edwards testified she spent "approximately 45 minutes to an hour" alone with Evans trying to comfort her. Edwards maintains she was just "having a conversation" with Evans the whole time and "was not on a fact-finding mission." On at least one occasion, Edwards escorted Evans to the bathroom and "stood outside the door" because, according to her, she thought Evans may try to harm herself. When they returned to the interview room, Evans continued to plead for help. Edwards responded: "Florence, I don't know what kind of help you need until you tell me." Evans then whispered, "I dropped a lit piece of paper on the floor. . . . I walked next door and waited until somebody saw the fire." Edwards immediately summoned Ross and asked Evans to repeat what she had said. Evans complied. Ross called in Alexander and Evans again repeated the statement. As a result, Alexander added another paragraph to his notes on the Voluntary Statement form:

I dropped a lit piece of paper on the floor. I rolled it up and lit it. It was writing paper. I dropped the paper on a rug. The rug caught on fire and I went out the front door. I went next door to my sisters [sic] house and just waited.

I waited about two hours until someone saw the fire. I got some kerosene in a cup and poured it on the rug. The fire got bigger and as I left it was burning a lot [sic]. I was hurting inside about seeing people do people wrong. Please get me some help. Please get me some help. I lit the fire with a match. I don't remember who found the fire. I got the kerosene out of the blue jug and put it back on the porch.

The interview ended at 6:01 p.m. Alexander read his notes back to Evans and she subsequently signed and initialed the "Voluntary Statement." As a result, the officers immediately placed her under arrest.

A Chesterfield County grand jury indicted Evans on three counts of murder on April 13, 1994. On May 1–4, 1998, the trial court held a *Jackson v. Denno* [4] hearing to determine the admissibility of Evans's oral and written statements of March 14, 1994. During that hearing, agents Alexander, Edwards and Ross testified to the aforementioned version of events. Evans also testified and offered a slightly different description of the interview. Although she acknowledged asking for help and signing a paper during the interview, she claimed she thought her signature was required to "get me some help." She also claimed to have repeatedly asked to speak with her cousin, Inez Robinson, during the interview, but the agents prevented her from doing so.

Robinson also testified. She described how she had attempted to speak with Evans during the interview, but was restricted to the station's waiting room until after Evans's arrest. Robinson testified that "[w]hen [Evans] saw me, she just run [sic] to me and held me. She said she told them she wanted to get to me.... She kept crying out to see me. They would not let her see me." Additionally, Robinson claimed that Evans told her the officers "pushed her to sign some papers."

The trial court suppressed Evans's oral and written statements to the police. This appeal followed.

---

**4.** *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

## LAW/ANALYSIS

A criminal defendant is entitled to an independent evidentiary hearing outside the presence of the jury to challenge the introduction of evidence "that was allegedly obtained by conduct violative of the defendant's constitutional rights." *State v. Patton,* 322 S.C. 408, 410, 472 S.E.2d 245, 247 (1996) (quoting *State v. Blassingame,* 271 S.C. 44, 47–48, 244 S.E.2d 528, 530 (1978) (citing *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964))); *see also State v. Patton,* 322 S.C. 408, 411, 472 S.E.2d 245, 247 (1996) (requiring a criminal defendant to "articulate specific factual and legal grounds to support his contention that evidence was obtained by conduct violative of his constitutional rights."). Where the State seeks to introduce a defendant's statement into evidence, the touchstone of the evidentiary hearing is whether the statement was voluntarily produced. *State v. Washington,* 296 S.C. 54, 370 S.E.2d 611 (1988). A trial judge determines the voluntariness of a defendant's statement by looking to the totality of the circumstances surrounding its production including the defendant's background, experience, and conduct. *State v. Franklin,* 299 S.C. 133, 382 S.E.2d 911 (1989).

Custody is not a prerequisite of a voluntariness inquiry, but it is a factor to be considered. *Franklin,* 299 S.C. 133, 382 S.E.2d 911; *State v. Creech,* 314 S.C. 76, 441 S.E.2d 635 (Ct.App.1994). If the statement occurred while the defendant was in custody, then in addition to a voluntariness inquiry, a court must ensure the police complied with the dictates of *Miranda* and its progeny. *Id.*

"*Miranda* warnings are required for official interrogations only when a suspect 'has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *State v. Easler,* 327 S.C. 121, 127, 489 S.E.2d 617, 621 (1997) (quoting *Miranda,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). Unlike the subjective nature of a voluntariness inquiry, custody is determined by an objective analysis of "whether a reasonable man in the suspect's position would have understood himself to be in custody." *Id.* at 128, 489 S.E.2d at 621.

■ In this case, the trial court determined that Evans was entitled to *Miranda* warnings because she experienced "the functional equivalent of interrogation and ... custody." Although the court articulated the appropriate objective standard of custody, it went on to comment that "[y]ou have to also take into account that she was at the time in her mid–20s, mildly retarded, no evidence of any record so, therefore, no real evidence of exposure." It is unclear from the record whether the court addressed its comment to the objective custody determination or the subjective voluntariness analysis.[5]

■ It is not the province of a reviewing court to weigh competing testimony and arrive at a custody determination. That is left to the trial court. *State v. Primus*, 312 S.C. 256, 440 S.E.2d 128 (1994). Our review of the trial court's custody ruling "is limited to a determination of whether the ruling by the trial court is supported by the testimony." *State v. Easler*, 322 S.C. 333, 342, 471 S.E.2d 745, 751 (Ct.App.1996), *modified on other grounds*, 327 S.C. 121, 489 S.E.2d 617 (1997) (citing *Primus*, 312 S.C. 256, 440 S.E.2d 128). We are unable to discern from the appellate record whether the trial court's comments on Evans's personal characteristics were part of its custody determination or merely a reminder to defense counsel that the court had yet to determine the voluntariness of Evans's statement. We therefore reverse and remand this case to the trial court for entry of a more definite order setting forth the factual findings which support its custody determination.

**REVERSED AND REMANDED.**

HUFF and HOWARD, JJ., concur.

---

5. Although the trial court did not determine whether Evans's statement was the product of coercion, it cautioned the defense that it would revisit the issue of voluntariness if Evans testified at trial and the State sought to impeach her testimony with the excluded statement.